IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

NOV 1 9 2007

GWENDOLYN V. ANDREWS,

    Plaintiff,

v.

                            Civil Action No. 3:07cv447

VIRGINIA UNION UNIVERSITY,
MILLICENT J. CARVALHO,

    Defendants.

## MEMORANDUM OPINION

This action arises from allegedly discriminatory actions by Defendants, Virginia Union University ("VUU") and one of its employees, Dr. Millicent Carvalho ("Carvalho") (collectively "Defendants"), against Plaintiff, Rev. Gwendolyn Andrews ("Andrews"). Andrews' Complaint identifies four counts, three under Title VII of the Civil Rights Act of 1964 (religious discrimination, failure to accommodate, and retaliation) and one under Virginia common law (defamation). All four counts are asserted against VUU. Carvalho is a defendant only as to Count IV, defamation.

This matter is presently before the Court on Defendants' Motion To Dismiss Plaintiff's Claim Pursuant To Federal Rule 12(b)(6) (Docket No. 4). For the reasons set forth below, the Motion is denied as to all counts.

## BACKGROUND

Andrews is an ordained minister with a masters of divinity degree. Consequently, she uses the title, "Reverend," personally and professionally. Andrews also has an additional masters degree in social work but does not hold a doctorate — a so-called "terminal degree."

VUU is an historically black private university located in Richmond, Virginia. Andrews joined the faculty of VUU in 2001 as an Assistant Professor of Social Work and as Chairperson of the Department of Social Work. The facts alleged in the Complaint demonstrate that Andrews was effective in her role as Chairperson. Indeed, during Andrews' tenure, VUU's Department of Social Work obtained accreditation and tripled its enrollment. In 2005, Andrews received the "Outstanding Faculty of the Year Award" at VUU. Throughout this time, Andrews was addressed as "Reverend" by students, faculty, and administration at VUU. VUU's website and printed faculty directory, as well as Andrews' employment contract, referred to her as "Rev. Gwendolyn Andrews."

On October 18, 2005, VUU's Interim Provost and Vice President for Academic Affairs, Dr. Gloria James, sent an email to several members of the faculty. The email stated, in part:

> This note is to inform you that the only academic titles that are acceptable at the undergraduate level are: Dr. (Ph.D./Ed.D.); Professor, Ms., Mrs, Mr, Dean, Chair,) [sic]. We will no longer have students address faculty as Reverend. This is totally

2

> inappropriate for our academic setting.
> Please inform faculty.

(Docket no. 1, Exhibit C.)

The next day Andrews lodged an informal verbal complaint with her supervisor, Dr. Emmanuel Onyedike. Andrews complained to Onyedike that she believed that the email discriminated against her for expressing her religious beliefs, to wit: using the title, "Reverend." Andrews' sentiments were echoed shortly thereafter in a student-written "Letter to the Editor" that appeared in VUU's student newspaper.[1]

Andrews contends that her complaint to Onyedike and the student letter angered VUU's administration. On November 1, 2005, several days after the student's letter was published, James convened a meeting of VUU Deans and Chairs. In what is said to be a reference to Andrews, James stated that she was "pissed" that a faculty member without a terminal degree would cause problems by insisting on being called "Reverend."

Three months after the meeting, Andrews learned informally that her appointment as the Chair of the Department of Social Work would not be renewed. While Andrews was still serving as Chair, VUU posted a notice on its website seeking applications for the

---

[1] Referring to James' email, the letter stated, "This blew my mind! How can anyone tell students how to address their faculty members, especially those who have been called to minister? . . . I am a student, and I will always refer to each of the named faculty members [including Andrews] as Reverend."

3

position occupied by Andrews.   Soon thereafter, VUU informed Andrews that her demotion was necessitated by the accreditation standards which the university must meet which purportedly required that all department chairpersons hold terminal degrees.   Andrews contends that this excuse was pretextual because the accrediting body, the Southern Association of Colleges and Schools, had no such requirement.

Andrews proceeded to lodge several complaints with the university administration.  By letter to James and VUU's President, Dr. Belinda Anderson, Andrews stated that her removal — which occurred without input from the Department of Social Work — violated the accreditation standards.  Andrews sent a second letter to Anderson and James complaining that she believed that she was being discriminated against on the basis of religious expression.

On June 9, 2006, roughly six months after Andrews' use of Reverend became an issue, VUU officially notified Andrews that she would not be renewed as Chair of the Social Work Department. Notwithstanding the fact that Andrews would retain her position as Assistant Professor of Social Work, the loss of the Chairmanship would result in a significant reduction in Andrews' annual salary. Andrews subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

Andrews asserts that the EEOC complaint prompted Defendants to engage in several retaliatory acts.  Andrews claims that another

4

member of the faculty told her that her replacement as Chair of the Social Work Department, Carvalho, was tasked with being a "headhunter" — a role that involved "making . . . Andrews' life so miserable that she would quit her employment."   Compl. ¶ 59. According to the Complalint, Carvalho did just that.

Andrews also alleges that Carvalho made false and defamatory statements about Andrews to the parents of several students and wrongfully accused Andrews of violating professional ethics by withholding files that were necessary for the Social Work Department to maintain accreditation.   Finally, Andrews alleges that her teaching load was increased above the norm.

Andrews initiated this action on July 30, 2007.  The Complaint was filed within ninety days of Andrews' receipt of a right-to-sue letter from the EEOC as prescribed by 29 C.F.R. § 1601.28(e)(1).

## DISCUSSION

Defendants bring this motion under Rule 12(b)(6) claiming that Andrews has not alleged adequate facts to support a plausible claim for relief.   The primary purpose of a Rule 12(b)(6) motion is to "provide a defendant with a mechanism for testing the legal sufficiency of the complaint."   United Mine Workers of Am., Inc., v. Wellmore Coal Corp., 609 F.2d 1083, 1086 (4th Cir. 1979).

5

Accordingly, the court's focus is on the allegations in the complaint and their relationship to the elements of the claims.[2]

In order to survive Rule 12(b)(6) motion to dismiss, a complaint must aver "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). In evaluating plausibility, the Court may not rely on mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Id. at 1965. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. at 1965, and critical elements of a claim must be, at a minimum, "suggested by the facts," id. at 1973. However, in testing the sufficiency of the complaint, the Court also must "accept[] all well-pleaded allegations in the plaintiff's complaint as true and draw[] all reasonable inferences from those facts in the plaintiff's favor."

---

[2] Defendants urge this Court to dismiss the Complaint because VUU is a "religious educational institution" exempted from Title VII discrimination claims by 42 U.S.C. § 2000e-1(a). To determine whether VUU is a religious educational institution, it is necessary to have far more information than can be ascertained from the Complaint and documents attached thereto. See EEOC v. Kamehameha Schools, 990 F.2d 458, 460 (9th Cir. 1993) ("[I]n determining whether an institution falls within the limited exemption for religious institutions under § 2000e-1, 'each case must turn on its own facts. All significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious.'" (citations omitted)). Moreover, Defendants' argument on this point is more properly characterized as an affirmative defense. The issue cannot be resolved at this stage of the action. See Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).

<u>Chao v. Rivendell Woods, Inc.</u>, 415 F.3d 342, 346 (4th Cir. 2005); <u>see also</u> <u>Structural Concrete Products, LLC v. Clarendon American Insurance Co.</u>, 2007 U.S. Dist. LEXIS 61714, *7 (E.D. Va. Aug. 22, 2007) (maintaining inference standard in light of <u>Twombly</u>).

## I.   Religious Discrimination

In Count I of the Complaint, Andrews alleges that VUU unlawfully discriminated against her in violation of 42 U.S.C. § 2000e-2(a).[3] There are two generally recognized methods by which a Title VII plaintiff may prevail on a religious discrimination claim: disparate treatment and failure to accommodate.   <u>See</u> <u>Chalmers v. Tulon</u>, 101 F.3d 1012, 1017 (4th Cir. 1996).

Count II is characterized as a failure to accommodate claim. Thus, it is logical to believe that Andrews intends to present a disparate treatment claim under Count I.   This was also how plaintiff characterized it in her brief and at oral argument. Count I will be assessed accordingly.

The thrust of a disparate treatment religious discrimination claim is that an employee "was treated differently because of her religious beliefs." <u>McIntyre-Handy v. West Telemarketing Corp.</u>, 97 F. Supp. 2d 718, 730 (E.D. Va. 2000).  Plaintiffs making disparate

---

[3]The relevant provision states, "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a).

treatment claims may utilize the burden-shifting framework of
McDonnell Douglas v. Green, 411 U.S. 792 (1973).[4]

Under the McDonnell Douglas framework, the plaintiff bears the
initial burden of production to present a prima facie case of
discrimination.[5]   See St. Mary's Honor Center v. Hicks, 509 U.S.

---

[4] There are several alternate methods available to plaintiffs
to prove disparate treatment religious discrimination claims.   In
the direct evidence method, a plaintiff must (1) prove that she
adequately performed her employment functions and (2) offer direct
or indirect evidence that proves that discrimination was more
likely than not the cause of the adverse employment action.   See
Chalmers, 101 F.3d 1017.   This functions like a traditional civil
case.

   Plaintiffs lacking sufficient direct evidence may attempt to
prove discrimination inferentially.   Such plaintiffs may proceed
under   a   theory   that   the   defendant   employer's   allegedly
discriminatory actions were the product of mixed motives, see 42
U.S.C. § 2000e-1(m), or that they were justified by an excuse that
was only a pretext to obscure discriminatory intent, see McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 805 (1973).   Under either of
these methods the employee must present a prima facie case from
which unlawful discrimination can be inferred.   See Desert Palace,
Inc. v. Costa, 539 U.S. 90, 101 (2003); Chalmers, 101 F.ed at 1017-
18 (citing McDonnell Douglas, 411 U.S. 792).   Because prima facie
cases can be predicated on indirect evidence, the initial burden on
the plaintiff making a prima facie case is typically lower than the
burden placed on a plaintiff in a direct evidence case.   This is
because Title VII plaintiffs rarely have the "good luck to have
direct evidence of discriminatory intent." St. Mary's Honor Center
v. Hicks, 509 U.S. 502, 534 (1993) (Souter, J., dissenting).
   For the purpose of adjudicating Defendants' Motion to Dismiss
Plaintiffs' Claim Pursuant To Federal Rule 12(b)(6) (Docket No. 4),
it is not necessary to determine if Andrews has alleged enough
facts to support a direct evidence employment discrimination case.
As long as the Complaint establishes a prima facie case under any
mode of proof, Andrews has met her burden of production and Count
I will not be dismissed for failure to state a claim.   That, of
course, does not foreclose Andrews from prosecuting her case on any
available theory.

[5]Although some courts have questioned the continuing validity
of McDonnell Douglas's burden-shifting framework in light of Desert

8

502, 506 (1993). This burden requires the plaintiff to allege sufficient facts to give rise to the inference that there is a causal connection between the plaintiff's religious status and an adverse employment action. See McIntyre-Handy, 97 F. Supp. 2d at 730. There is no one way to set forth a prima facie case; what must be alleged to prove a prima facie case of discrimination will vary based on the facts of case. See Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981). Thus, the necessary elements of a prima facie case of disparate treatment are "flexible." Kafu v. Kelley Servs., 2007 U.S. Dist. LEXIS 10444, *7 fn.6 (D.S.C. Jan. 24, 2007).

To assess prima facie cases of discrimination, courts typically rely on the factors cited in St. Mary's Honor Center to arrive at a four-part test. The wording of the tests often vary subtly, based on the factual circumstances of the case. In Brinkley v. Harbour Recreation Club, 180 F.3d 598 (4th Cir. 1999), the Fourth Circuit stated the familiar four-element test in terms that are particularly appropriate to the facts of this action:

> To establish a prima facie case of discrimination under Title VII, [the Plaintiff] must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's

---

Palace, see e.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987 (D. Minn. 2003), the framework is still utilized in the Fourth Circuit. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 317-18 (4th Cir. 2005).

> legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants outside the protected class.

Id. at 607.

Assuming, as must be done, that Andrews' allegations are true, see Chao, 415 F.3d at 346, sufficient facts have been alleged in the complaint to present a prima facie case of disparate treatment. Therefore, Andrews' "claim to relief []is plausible on its face," Twombly, 127 S. Ct. at 1974, and the motion to dismiss the religious discrimination claim in Count I will be denied.

Andrews has stated that she is an ordained minister of the Baptist faith. Section 2000e-2's prohibition on religious discrimination does not differentiate between religions that qualify as protected classes and those that do not. Thus, Andrews' status as an adherent to the Baptist faith is sufficient to designate her as a member of a protected class for the purposes of this action.[6]

---

[6] Some courts have suggested that in order to support a religious discrimination claim, a plaintiff must be of a different religion from the defendant, see e.g., Richardson v. JM Smith Corp., 473 F. Supp. 2d 1317, 1331 (M.D. Ga. 2007), or the plaintiff must show that her replacement was of a different religion, see e.g., Rabinovitz v. Pena, 89 F.3d 482, 486 (7th Cir. 1997); Breech v. Alabama Power Co., 962 F. Supp. 1447, 1457 (S.D. Ala. 1997). That view has no backing in § 2000e-2, which makes it unlawful for an employer to discriminate "because of such individual's . . . religion." There is no statutory requirement that the employer adhere to a different faith than the plaintiff. Reading such a requirement into the statute is akin to saying that an African-American employer could not violate Title VII if he refused to hire African-American workers. Cf. Oncale v. Sundowner Offshore Serv.,

Andrews also has alleged several facts that demonstrate that she was well-qualified for the position as Chair of the Social Work Department at VUU: she possessed a masters degree in social work and had fifteen years of experience as a clinical social worker; VUU's Social Work Department first attained accreditation during Andrews' tenure as Chair; and the number of VUU social work graduates matriculating in masters degree programs increased. Further, Andrews was recognized for her job performance when she was granted the Outstanding Faculty of the Year Award for the year immediately preceding her loss of the Chair position. Notwithstanding these qualifications, Andrews was demoted from the position as Chair of the Social Work Department — an adverse employment action — and replaced by Carvalho.

Andrews has not, however, alleged that Carvalho is outside of her protected class - adherents of the Baptist faith.  Carvalho's religious affiliation, if any, is not identified in the Complaint. Assuming that Carvalho is Baptist, this action would fall within the "categor[y] of cases that call for an exception" to the fourth part of the prima facie test. See Miles v. Dell, Inc., 429 F.3d 480, 487-88 (4th Cir. 2005).  The purpose of the fourth element - that the plaintiff's replacement be from outside the relevant

---

Inc., 523 U.S. 75 (1998) (holding that a heterosexual man can bring a Title VII claim for discrimination "because of sex" against other heterosexual men).  Thus, Andrews' claims are not precluded by the fact that VUU is a Baptist-affiliated institution.

protected class - is to "eliminate the inference of non-discrimination" that would flow from an employer's decision to replace the plaintiff with an employee of the same race, color, religion, or national origin.  Id. at 488.  There are, of course, circumstances where the inference of non-discrimination is not warranted.   See id. 488-89 (listing examples).  For example, a situation in which a restaurant owner fires an Hispanic employee who "looks ethnic," however one would define that, and replaces her with an Hispanic employee who "looks white" would not give rise to a reasonable inference of non-discrimination.  On the contrary, it would be just as reasonable to infer that the owner was motivated by the discriminatory purpose of giving the appearance that only Caucasians were employed in the establishment.

As in the example above, it is common for individuals of the same religious denomination to outwardly manifest their religious convictions to varying degrees.  An individual's religion is a product of that individual's conscience, and the sincerely held religious beliefs and practices of individuals who ascribe to the same denomination may be markedly different; the religious practices of one Baptist may be quite unlike another.  Andrews, by maintaining the religious title, Reverend, is publicly manifesting her status as a Baptist.  Andrews' replacement, Carvalho, makes no such public manifestation.  It follows that Andrews' replacement by Carvalho, even if they were both Baptists, does not give rise to

12

the inference of non-discrimination. Rather, it would be just as reasonable to infer that VUU had the discriminatory intent of giving the appearance that it did not have employee Baptist ministers as academic department chairpersons. Thus, it is of no consequence to the legal sufficiency of Andrews' claim that she did not allege that her replacement was of a different religion.

Finally, Andrews has alleged that she is an ordained minister of the Baptist faith and that the exercise of her beliefs — insisting on being called "Reverend" — was the cause of VUU's actions. The close proximity in time between Andrews' assertion of her religious beliefs and the loss of the Chair position are sufficient to give rise to a plausible inference of unlawful discrimination. Consequently, the allegations, presumed to be true and viewed as an integrated whole, meet the threshold of a prima facie case and are sufficient to survive a motion to dismiss.

## II.  Failure To Accommodate

In Count II, Andrews asserts that VUU failed to make reasonable accommodations for the exercise of her religious belief that she should be addressed as "Reverend." The basis of a failure to accommodate claim is that an employer refused to make "reasonable accommodations, short of undue hardship, for the religious practices of his employees." Trans Worlds Airlines, Inc. v. Hardison, 432 U.S. 63, 74 (1977); see also 42 U.S.C. § 2000e(j)

13

(defining religion as "all aspects of religious observance and practice, as well as beliefs, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship . . . .").

As with disparate treatment claims, a plaintiff asserting a failure to accommodate claim need only present a prima facie case to survive a motion to dismiss. See Chalmers, 101 F.3d at 1019. The Fourth Circuit articulated the elements of a prima facie failure to accommodate case in Chalmers, stating, "[A] plaintiff must establish that: '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" Id. (quoting Philbrook v. Ansonia Bd. Of Educ., 757 F.2d 476, 481 (2nd Cir. 1985).

It is clear that Andrews has alleged sufficient facts to satisfy the second and third elements of a failure to accommodate claim. VUU cannot deny that it was aware of Andrews' use of the religious title, "Reverend." VUU referred to Andrews as "Rev." on its website, faculty directory, and in Andrews' employment contract. Andrews also lodged a timely complaint with her supervisor, Onyedike, informing him of her objection to James' decision to prohibit faculty members' use of Reverend and her desire to continue using the title.

14

Likewise, there is no doubt that Andrews has alleged that she suffered specific consequences for continuing to assert that she should be called Reverend by her students and colleagues. She asserts both that she was demoted from her Chairmanship and that her pay was reduced. Either one of these adverse consequences can properly be characterized as "discipline." Cf. id.

The dispositive issue on Andrews' failure to accommodate claim is whether she has satisfied the first element of the test outlined in Chalmers. Is Andrews' insistence on using the title "Reverend" a "bona fide religious belief"? The court's task is complicated by the sensitive and personal nature of religious beliefs and the paucity of clear authority on this issue.[7]

Andrews refers to her use of the title as "religious expression," Compl. ¶ 1, but courts have held that not all

---

[7] Title VII's definition of religion is unhelpful: "The term 'religion' includes all aspects of religious observance and practice, as well as belief . . . ." 42 U.S.C. § 2000e(j). This definition is too expansive to be of much use. Interpreting this provision, the EEOC defines religion as

> moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. . . . The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee . . . .

29 C.F.R. 1605.1 (2007). This definition is also rather unhelpful in the context of a motion to dismiss. The EEOC's definition is laden with qualifying terms that are difficult to assess without a great deal of factual development. In particular, whether or not an individual sincerely believes something is difficult to divine from the sparse allegations found in most notice pleadings.

religious expressions are religious beliefs.[8] Neither the Supreme Court nor the Fourth Circuit have set forth unambiguous guidelines for distinguishing bona fide religious beliefs from personal preferences. For that reason, the court looks to the holdings of other jurisdictions for guidance.

The United States Court of Appeals for the First Circuit was confronted with a similar issue in EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49 (1st Cir. 2002). In Union Independiente, an employee who was a member of the Seventh-Day Adventist Church claimed that his religious beliefs prohibited him from joining a union. Id. at 51. According to the First Circuit, in order to establish that a belief or practice must be accommodated under Title VII: "the plaintiff must demonstrate both [1] that the belief or practice is religious and [2] that it is sincerely held." Id. at 56. Elaborating on this two-part test, the Union Independiente court explained that the religious nature of a belief is generally not at issue, but whether the belief is sincerely held "should be reserved 'for the factfinder at trial, not for the court [upon a pretrial motion].'"

---

[8] See, e.g., Tiano v. Dillard Dep't Stores, 139 F.3d 679 (9th Cir. 1998) (holding that an employee's religious pilgrimage was a personal preference because the employee's Catholic faith did not require that the pilgrimage be made during the employer's busiest season); Anderson v. U.S.F. Logistics (IMC), Inc., 2001 U.S. Dist. LEXIS 2807 (S.D. Ind. 2001) (holding that an employee's use of "have a blessed day" with customers was a personal preference rather than a bona fide religious belief because it was not a required element of the employee's faith).

<u>Id</u>. The First Circuit's reasoning in <u>Union Independiente</u> is persuasive and the court will rely on it to dispose of the present matter.

Title VII's definition of religion "includes all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Websters Third New International Dictionary defines "reverend" as "a member of the clergy."[9] Andrews uses the title in this fashion to denote her status as an ordained minister of the Baptist faith. Under Title VII's expansive definition of religion, the religious nature of the title, Reverend, as it is used by Andrews, is obvious.

It may well be that Andrews' use of Reverend in her capacity as a university professor is a personal preference. There is some evidence in the Complaint to support this assertion. For instance, she states that "she thought the students should be free to call their professors by a religious title if the professor so chooses . . . ." Compl. ¶ 39. This statement evidences more of a concern for her students' preferences than for her own religious beliefs.

However, <u>Chao</u>, 415 F.3d at 346, instructs that "all reasonable inferences" should drawn in favor of the plaintiff in the context of a motion to dismiss. Andrews states that she has used the title "Reverend" both personally and professionally since she became an ordained minister. She also characterizes her use of the title as

---

[9] Websters Third New International Dictionary 1943 (2002).

17

a "religious belief[]." Compl. ¶ 1. The court is not in a position, at this stage of the action, to conclude that Andrews uses the title Reverend as matter of personal preference rather than as a practice that arises from the sincere belief that ministers should called Reverend. Because it is reasonable to infer from the alleged facts that Andrews has such a sincere belief, her failure to accommodate claim will not be dismissed for legal insufficiency.

## III. Retaliation

Andrews' third claim is that VUU retaliated against her for objecting to the administration's decision to disallow the use of the Reverend title. Andrews has alleged sufficient facts to make a plausible retaliation claim and thus the motion to dismiss Count III will be denied.

Under Title VII, an employer may not retaliate against an employee for (1) opposing an employment practice that is unlawful under Title VII or (2) participating in an "investigation, proceeding, or hearing" that is conducted under Title VII. 42 U.S.C. § 2000e-3(a). "Discrimination" is defined more broadly in the retaliation provision of Title VII, § 2000e-3, than it is in other substantive Title VII provisions. Plaintiffs need not prove an adverse employment action to maintain a retaliation claim. <u>Burlington Northern & Santa Fe Ry. v. White</u>, 126 S. Ct. 2405, 2412-13 (2006). Retaliatory discrimination includes any action by the employer that "a reasonable employee would have found [to be]

materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"   Id. at 2415.

Andrews' allegations satisfy the elements of a retaliation claim. Following VUU's decision to prohibit the use of Reverend, Andrews filed Charge of Discrimination with the EEOC.  That was a protected action under § 2000e-3, and the filing of such a charge is sufficient to bring Andrews within the purview of the anti-retaliation provision.[10]

Assuming that Andrews' allegations are true, VUU engaged in several retaliatory actions that a reasonable employee would have found to be materially adverse, including: telling Andrews' replacement to find an excuse to fire her; making false and defamatory statements to the parents of Andrews' student advisees; informing the student bookstore to refrain from filling Andrews' textbook orders; and breaking into and "trash[ing]" Andrews' office on two separate occasions.   Compl. ¶¶ 69, 70.   A reasonable employee would be dissuaded from pursuing a discrimination claim in light of such actions.  See Burlington Northern 126 S. Ct. At 2415.

IV.  Defamation

---

[10] Because the EEOC complaint triggers Title VII anti-retaliation protection, the court need not decide at this time whether Andrews' informal complaints to her supervisor triggered the protection at an earlier time.  For the purposes of ruling on a motion to dismiss it is sufficient to note that Andrews has stated a claim upon which relief may be granted.

Andrews' fourth claim is a Virginia common law defamation claim against Carvalho. Because the defamatory statements are alleged to have been made within the scope of Carvalho's employment, Count IV is also alleged against VUU.

Under Virginia law, the elements of defamation are "(1) publication (2) of an actionable statement with (3) the requisite intent." _Jordan v. Kollman_, 612 S.E.2d 203, 206 (Va. 2005). Publication can involve an oral statement made to, or overheard by, a third party. _Snyder v. Fatherly_, 163 S.E. 358, 363-64 (Va. 1932). An actionable statement is a statement of fact that is false. _Jordan_, 612 S.E.2d at 206-07. The requisite intent standard varies based on the status of plaintiff as a public or private figure. Where the plaintiff is a private individual, the defendant may be found liable if the defendant knew the statement to be false or negligently failed to ascertain whether the statement was false. _Gazette, Inc. v. Harris_, 325 S.E.2d 713, 725 (Va. 1985).

Further, under Virginia law, certain statements are actionable _per se_, including "[t]hose which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment." _Carwile v. Richmond Newspapers, Inc._, 82 S.E.2d 588, 591 (Va. 1954). Thus, "[e]very false and unauthorized imputation, spoken, written, or printed which imputes to a business or

20

professional man conduct which tends to injure him in his business or profession is libelous and actionable without allegation or proof of special damages." Id.

Under the relevant Virginia law, Andrews has alleged sufficient facts to support a common law defamation claim. Andrews' complaint identifies at least two allegedly defamatory statements made by Carvalho. Each will be discussed in turn.

The first allegedly defamatory statement was an oral statement to the parents of Andrews' student advisees asserting that the students would not be able to graduate on time because Andrews had "misadvised" the students. This statement was published because it was made to several third parties.

The defendants contend that the statement appears to be an opinion. However, it reasonably can be construed as a statement of fact because it is "laden with factual content" and the underlying facts are allegedly false. See Richmond Newspapers, Inc. v. Lipscomb, 362 S.E.2d 32, 43 n.8 (Va. 1987). By stating that Andrews' "misadvised" the advisees, Carvalho's statement presupposes the existence of prior statements made by Andrews in her capacity as advisor to the students. Accordingly, Carvalho's statement is laden with factual content. Further, Carvalho's statement implies that the advice given by Andrews caused the students' failure to graduate on time. Andrews maintains, however,

that the students did not graduate on time because they had chosen
to "rush" fraternities and sororities.

The statement also supports the requisite intent; Andrews is
a private individual and therefore the statement need only have
been made negligently to be actionable.  Andrews alleges that the
statement was "bald and unsupported," Compl. ¶ 60, which supports
the inference that, even if Carvalho did not <u>know</u> that the
statement was false, she was at least negligent in arriving at that
the conclusion.

Moreover, the statement imputes Andrews' ability to perform
her job.  Under Virginia law, such a statement, if false, is
actionable per se.  <u>See</u> <u>Carwile</u>, 82 S.E.2d at 591.

Andrews alleges that Carvalho made defamatory statements on a
second occasion.  Carvalho sent an email to Andrews and another VUU
professor, Raymond Hylton ("Hylton"), stating that Andrews had not
supplied Carvalho with files and correspondences that were
necessary for the social work department to receive accreditation.[11]

---

[11] The email stated:
    Can you provide copies of the department's
correspondence with CSWE [Council on Social Work
Education], for example, the reaffirmation letter,
assessments and other related documents?
    I met with CSWE officials at the BPD conference,
last week; they were surprised to learn that the former
chair, [sic] of VUU's social work department has not
provided copies of files and correspondence with CSWE
regarding accreditation and reaffirmation.  I want to
remind you of NASW's [National Association of Social
Workers] Code of Ethics and ask that you return all
departmental correspondence, files, surveys, and other

22

Defendants argue that the statement to Hylton is an intracorporate communication for which VUU enjoys an "absolute privilege." (Mem. in Supp. of Def.'s Mot. to Dismiss Pl.'s Claim 7, Docket no. 5.) Under Virginia law, however, intracorporate communications are subject to a qualified, not absolute, privilege. See Larimore v. Blaylock, 528 S.E.2d 119, 123 (Va. 2000). The qualified privilege that attaches to communications between coworkers does not apply to statements made with common-law malice. See Great Coastal Express v. Ellington, 334 S.E.2d 846, 854 (Va. 1985). Common-law malice, in the context of defamation, is defined as

> some sinister or corrupt motive such as
> hatred, revenge, personal spite, ill will, or
> desire to injure the plaintiff; or what, as a
> matter of law, is equivalent to malice, that
> the communication was made with such gross
> indifference or recklessness as to amount to a
> wanton or willful disregard of the rights of
> the plaintiff.

Id. at 851 n.3 (quoting Preston v. Land, 255 S.E.2d 509, 511 (Va. 1979)).

Facts alleged in the complaint plausibly support the conclusion that the Carvalho's email to Hylton was made with common-law malice, defeating the qualified intracorporate privilege. Andrews' allegation that Carvalho was tasked with engaging in acts that would prompt Andrews to quit, (Compl. ¶ 59),

---

documentation immediately.
(Compl. Exhibit H, Document No. 8.)

permits the inference that Carvalho had a "corrupt motive" - the desire to injure. Similarly, it is plausible to infer that the statement was made with at least gross indifference because Andrews alleges that Carvalho was in possession of the files that Carvalho accused Andrews of withholding. (Compl. ¶ 64.)

Returning to the elements of defamation under Virginia law, the statement was published because it was sent to Hylton, a third party not subject to qualified privilege. See Larimore, 528 S.E.2d at 123; Snyder, 163 S.E.2d at 363-64. It impugned Andrews' integrity and her ability to perform her job in accordance with her profession's ethical standards, which makes the statement actionable per se. See Carwile, 82 S.E.2d at 591. Lastly, Andrews alleges that she had informed Carvalho, before the email was sent, that the files in question were in Carvalho's office. Therefore, the reasonable inference is that the statement was false and that made it was published with a negligent disregard for the truth, if not maliciously. Thus it satisfies the requisite intent. See Gazette, Inc. v. Harris, 325 S.E.2d at 725.

Each of the statements discussed above states a plausible claim upon which relief may be granted. Accordingly, Defendants' motion to dismiss Count IV is denied.

## CONCLUSION

For the foregoing reasons, Andrews has properly pled facts that, if true, will support plausible claims for relief.

24

Therefore, Defendants' Motion To Dismiss Plaintiff's Claim Pursuant To Federal Rule 12(b)(6) (Docket No. 4) is denied as to all Counts.

It is so ORDERED.

_____/s/_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 16, 2007

25