IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



GWENDOLYN V. ANDREWS,

     Plaintiff,

v.                             Civil Action No. 3:07cv447

VIRGINIA UNION UNIVERSITY,
et al.,

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion for Summary Judgment (Docket Nos. 27, 29) filed pursuant to Fed. R. Civ. P. 56. For the reasons sent forth below, the Motion for Summary Judgment will be denied in part and in granted in part.

### BACKGROUND FACTS

Plaintiff Reverend Gwendolyn V. Andrews ("Andrews") filed this action against Defendants Virginia Union University ("VUU") and Millicent J. Carvalho, Ph.D. ("Carvalho"). Andrews asserts claims of religious discrimination, denial of reasonable accommodation for religious expression and retaliation against VUU, and she asserts a claim for defamation against VUU and Carvalho. VUU and Carvalho moved for summary judgment, urging that all counts of Andrews' Complaint fail as a matter of law.

Andrews has a Bachelor of Arts in Sociology from Virginia State University and a Master's degree in Social Work from Virginia Commonwealth University.   For approximately fifteen years she worked as a social worker in several different positions, including stints as a clinical social worker in the acute care unit at Central State Hospital in Petersburg, Virginia, as a trainer and development coordinator at Central State Hospital, as a mental health clinician and clinical social work program director for the Richmond Behavioral Health Authority, and finally as a clinical social work supervisor and forensic coordinator at the Piedmont Geriatric Hospital in Burkeville, Virginia.   Andrews has also provided social work training to local and state government social workers.

VUU is a private educational institution located in Richmond, Virginia.  VUU's foundation is connected to the Baptist Church and its religious ties continue today as it is affiliated with the Baptist religion and operates a graduate School of Theology.   Several pastors or former pastors hold executive positions at VUU.  Belinda C. Anderson, Ed.D ("Anderson") is the President of VUU and Dr. Gloria James ("James") is the Interim Provost and Vice President for Academic Affairs.

In 2001, Andrews was employed at VUU as an Assistant Professor of Social Work.   Andrews served as the Chairperson

2

("Chair") of the Department of Social Work from 2001 until 2006. During that time, Andrews helped to transform the Social Work Department into a free-standing academic department at VUU, presided over a three-fold increase in the student enrollment in the department, assisted with obtaining accreditation for the department by the Council on Social Work Education ("CSWE"), and played a role in sending the largest number of students majoring in Social Work to masters programs. In 2005, Andrews was recognized and honored with the Scott and Stringfellow Outstanding Faculty Member of the Year Award.

Andrews also is an ordained minister. She received a Master's degree in Divinity from VUU and became an ordained minister in 2001. Upon receipt of this degree, her license, and her ordination, Andrews started to use the title "Reverend." Throughout most of the time that Andrews was employed at VUU, the University recognized her position as an ordained minister and referred to her as "Rev. Gwen Andrews" in a variety of settings including in school newsletters, memoranda, emails, websites, and formal documents such as several of Andrews' employment contracts.

## A. SACS Warning

VUU is accredited by the Southern Association of Colleges and Schools ("SACS"). In July 2005, VUU received a letter dated July 11, 2005 from SACS in which SACS placed VUU on "warning" for

twelve months.    According to the letter addressed to Anderson, VUU's Religious Studies and Philosophy Department violated SACS Guideline CS 3.7.1 by failing to insure that twenty-five percent of the course hours taught in the department were taught by faculty members holding a "terminal degree" in the discipline.   That SACS requirement applied to all departments at VUU, but only the Religious Studies and Philosophy Department was cited in the letter for failing to meet this standard.[1] The Department of Social Work did not violate the guideline.

## B. Email Regarding Academic Titles

On October 18, 2005, James sent an email to all VUU Deans to explain a new policy respecting the use of academic titles by VUU faculty.   The email stated that "the only academic titles that are acceptable at the undergraduate level" are Dr., Professor, Ms., Mrs., Mr., Dean, and Chair.   The email further announced that addressing faculty as "Reverend" was not acceptable, and, indeed, would be "inappropriate."   The new academic title policy was not required by SACS, by the recent warning from SACS, or by the CSWE. James, however, has testified that, although SACS did not require universities to eliminate the title "Reverend," she did consider

---

[1] Instead of using professors who had a doctorate in religious studies and philosophy, the department used professors who held a Doctor of Ministry to satisfy the requirement of faculty holding a terminal degree.

4

the SACS warning and the consequent close scrutiny by SACS when she implemented the policy on her own accord.

A day or so after receiving James' email with the new policy, Andrews complained to her supervisor, Dr. Emmanuel U. Onyedike ("Onyedike"). Andrews told Onyedike that she thought the new policy was improper, and, as a person of faith, she thought the email discriminated against her for referring to herself as Reverend.

At about the same time, James became aware of Andrews' unhappiness with the policy. Thereafter, on November 1, 2005 at a meeting of VUU Deans and Chairs, James discussed objections that had been made to the policy, alleged that one faculty member was inappropriately circulating her original email with the policy, and stated that she was "pissed about the lack of confidentiality of some faculty with nothing else to do." James expressed displeasure with the way that the new policy was being disseminated, claiming that "she had emailed the memo to only 4 people, but certain faculty, with nothing else to do, passed out the memo and it was blown out of proportion." Furthermore, James went on to say that the memorandum was circulated by "one faculty member." James said later that she assumed the faculty member who circulated the email was Andrews.

Andrews never implemented James' new policy for academic titles and at no point told her students to refrain from referring to her as "Reverend."

C.      **Andrews' Failure to Be Reappointed Chair of the Department of Social Work**

After the SACS warning, VUU decided to focus its hiring of faculty on individuals with terminal degrees and to require that all future chairs of all departments have terminal degrees.  VUU determined that the terminal degree for Social Work is a Ph.D. VUU's definition is based on the view of its SACS liaison, VUU Professor Gerald Lord, whose view is that, if any institution in the country offered a Ph.D. degree in a program, then any master's degree would no longer be considered a terminal degree.  Andrews, however, has offered evidence that, in the academic world, a terminal degree in the field of social work is either a Masters ("MSW") degree or a Ph.D. degree in Social Work.  The current Director of CSWE, Dr. Dean Pierce ("Pierce") supports that view, stating that a Ph.D. is the terminal educational degree and a MSW is a terminal practice degree.

Individuals serve as Chair of a VUU department based on presidential appointment.  The Chair is appointed for a period of ten months, and each year the appointment is either renewed for the current Chair or a new individual is appointed Chair.  VUU has

presented evidence that its practice is to rotate department Chair assignments.   The record also shows that Andrews and others[2] actually have served as Chair for several uninterrupted terms.   In February 2006, Andrews informally learned that she would not be reappointed as Chair of the Department of Social Work.  Andrews was one of four individuals who did not have a Ph.D. and who were reappointed as Chair for the 2006-2007 academic year. In the 2007-2008 academic year, the Chairs of all departments at VUU held a Ph.D.

Following Andrews' removal, Carvalho was hired as the Chair of the Department of Social Work.  Several members of VUU faculty and staff, including Andrews, testified that Carvalho was not only hired to replace Andrews as Chair, but also that part of her mission was to "get rid" of Andrews.  There also is evidence that Carvalho personally disliked Andrews and that Carvalho was referred to Andrews in the following statements:  "people around here make me want to kill them," "stupid stubborn ass bitch," "I can't stand that bitch," "she makes me sick."  Based on the record, it is reasonable to infer that, when making those statements, Carvalho was referring to Andrews.

---

[2] Valerie West-Hill who was one of the four individuals not reappointed as Chair for the 2006-2007 academic year, had previously served as the Chair of the Fine Arts Department for six years.

## D. Accusations that Andrews Misadvised Students

Near the end of Andrews' employment, a dispute arose over advice that Andrews had given several students about course selection and course requirements. After Carvalho took over as department Chair in 2006, she had two professors review the course selection of seniors in the Department of Social Work. Carvalho told those professors that some of the students had been misadvised. Andrews was not informed of the review or questioned about any of the circumstances of the situations in which the students allegedly were misadvised.

The heart of this so-called "misadvising" issue was whether students could take classes out of sequence. Andrews, acting within her discretion as Chair of the Department of Social Work, had allowed several students to take courses of out sequence. Carvalho has agreed that such a practice may be permissible at times, but she nonetheless considered that allowing students to take classes out of sequence was tantamount to misadvising students. In fact, Carvalho actually told several students and their parents that the students had been misadvised by Andrews, notwithstanding that Carvalho concedes  that, as Chair of the department, Andrews was vested with discretion to make the very decisions that Carvalho described as "misadvising" the students.

8

**E.      Accusations that Andrews Did Not Provide Carvahlo with Accreditation Documentation**

On November 3, 2006, Carvalho emailed Andrews requesting that Andrews provide certain documents pertinent to the accreditation of the Department of Social Work.  In the email, Carvalho insinuated that she previously had requested these documents from Andrews; that Andrews had failed to comply with the request;and that Carvalho had made statements relating to Andrews' failure to turn over the documents to CSWE officials.  A copy of the email was sent to Raymond Hylton ("Hylton"), the Dean of the School of Humanities and Social Services at VUU.  In response to the email, Andrews explained that Carvalho had never requested her to provide the documents and that, in fact, the documents were not in Andrews' possession, but in Carvalho's office (which previously had been used by Andrews).  Carvalho testified that, although she searched her office, she never found the accreditation documentation referenced by Andrews.

In the email dated November 3, 2006, Carvalho also "reminded" Andrews that she was bound by the National Association of Social Worker's ("NASW") Code of Ethics.  Carvalho stated that she gave that reminder because she felt that Andrews was "acting contrary to her own ethical standards as a Reverend and as a skilled master social worker."

9

## F. VUU Rescinded Andrews' Contract for the 2007-2008 Academic Year

In the Aril 2007, following the same procedure it had used in the past, VUU mailed Andrews an employment contract offering her a one year position as an assistant professor in the Department of Social Work.  VUU sent several letters with this information by way of certified mail and several phone calls were made to determine whether Andrews intended to return to VUU for the coming academic year.  Andrews, who was out of town tending to her sick mother and brother, never received the employment contract.  Nor did Andrews contact VUU to inquire about her contract.  After failing to hear from Andrews, VUU sent Andrews a letter, dated June 7, 2007, rescinding its offer of employment.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A material fact is one that might affect the outcome of the suit.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The initial burden is on the moving party to specify the propriety of summary judgment based on facts developed during the discovery, the pleadings, and supplemental affidavits.  See Celotex Corp. v.

10

<u>Catrett</u>, 477 U.S. 317, 322 (1986). The burden then shifts to the non-moving party who, in order to defeat summary judgment, must present evidence supported by the record, upon which a reasonable jury could find there to be a genuine issue for trial. The non-moving party may not rest upon mere allegations. <u>See Anderson</u>, 477 U.S. at 248. The factual record presented is interpreted in a light most favorable to the non-moving party. <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). If the non-moving party fails to establish existence of a material disputed fact, summary judgment is appropriate. <u>See Celotex Corp.</u>, 477 U.S. At 323.

These principles will control assessment of the defendants' motion seeking summary judgment on all of Andrews claims.

**Count I: Religious Discrimination**

Count I asserts a claim of religious discrimination under Title VII. There generally are two theories available for making religious discrimination claims; disparate treatment and failure to accommodate. <u>Chalmers</u>, 101 F.3d at 1017. It appears that Count I is intended to be based on the theory of disparate treatment as the

11

predicate for religious discrimination.[3]  The statute under which

Andrews is proceeding provides that:

> it shall be an unlawful employment practice
> for an employer . . . to fail or refuse to
> hire or to discharge an individual, or
> otherwise to discriminate against an
> individual with respect to compensation,
> terms, conditions, or privileges, because of
> such individual's race, color, religion, sex,
> or national origin.

42 U.S.C. S 2000e-2(a).  The statute also provides that an unlawful

practice is established when "the complaining party demonstrates

that race, color, religion, sex, or national origin was a

motivating factor for any employment practice, even though other

factors also motivated the practice."  The elements of this claim

are: (1) a discriminatory employment practice; and (2) and

discriminatory intent.  Ledbetter v. Goodyear Tire & Rubber Co.,

127 S.Ct. 2162, 2171(2007).

    The essence of a claim of disparate treatment is that the

plaintiff was treated differently because of her religious beliefs

or practices.  Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012,

1017 (4th Cir. 1996); McIntyre-Handy v. West Telemarketing Corp.,

97 F. Supp. 2d 718, 730 (E.D. Va. 2000).  To establish this claim,

Andrews must prove that VUU intentionally discriminated against her

because of her religious beliefs or practice.  Specifically, she

must prove, by a preponderance of the evidence, that she was

---

    [3] In Count II, Andrews asserts a claim of religious
discrimination based on a failure to accommodate her religious
beliefs.

12

treated differently and that her religious belief was a motivating factor such treatment. Chalmers, 101 F.3d 1017.

Andrews has the option of meeting her burden on summary judgment by offering either direct or circumstantial evidence, or by proceeding under the burden-shifting proof scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Evans v. Techns. Applications & Serv. Co., 80 F.3d 954 (4th Cir. 1996); Goldberg v. B. Green and Co., 836 F.2d 845, 847 (4th Cir. 1988). During oral argument on the pending motion, Andrews' counsel made clear that she is proceeding under the direct evidence mode of proof, not on the burden shifting mode.

Proof of discrimination by direct evidence is usually accomplished by offering either "direct evidence of a stated purpose to discriminate or circumstantial evidence of sufficient probative force to raise a genuine issue of material fact." Evans, 80 F.3d at 959; Goldberg, 836 F.2d at 848. Conclusory assertions of the defendant's mind-set and motivation are not enough to withstand summary judgment, nor is the plaintiff's own naked opinion. Goldberg, 836 F.2d at 848.

In evaluating Count I, the first issue is to determine whether Andrews' belief and practice is religious. Within the meaning of Title VII, religion exists in a fairly "broad framework" because "[r]eligion," as defined by 42 U.S.C. § 2000e(j) includes "all aspects of religious observance and practice, as well as

belief. . . . " 42 U.S.C. § 2000e(j); <u>Trans World Airlines, Inc.</u>
<u>v. Hardison</u>, 432 U.S. 63, 73-74 (1977); <u>Chalmers</u>, 101 F.3d at 1018.

One purpose of defining "religion" so broadly is to
minimize the need for judicial decisions on which particular
beliefs and practices qualify as a "religion" in order to avoid the
excessive entanglement of church and state prohibited by the First
Amendment.   <u>E.E.O.C. v. Union Independiente De La Autoridad De</u>
<u>Acueductos Y Alcantarillados De Puerto Rico</u>, 279 F.3d 49,(1st Cir.
2002). The E.E.O.C. has shed some light on the concept of religion
within Title VII by explaining that the religious nature of a
practice or belief includes any "moral or ethical beliefs as to
what is right and wrong which are sincerely held with the strength
of traditional religious views."  C.F.R.  § 1605.1 (stating that
this  standard is based on <u>United States v. Seeger</u>, 280 U.S. 163
(1965); <u>Welsh v. United States</u>, 398 U.S. 333 (1970)). Examination
of decisional law teaches that assessment of religious beliefs or
practices is made on a case by case basis, and is greatly dependent
on the factual record in each case.

It is clear that "Title VII's protections are not limited
to beliefs and practices that courts perceive as 'acceptable,
logical, consistent, or comprehensible to others,'" nor do E.E.O.C.
guidelines on religious discrimination require a specific religious
group to advocate the belief of the individual employee. <u>Cloutier</u>
<u>v. Costco Wholesale</u>, 311 F. Supp.2d 190, 196 (quoting <u>Thomas v.</u>

14

<u>Review Bd. of Ind. Employment Sec. Div.</u>, 450 U.S. 707, 714 (1981))
(citing 29 C.F.R. § 1605.1). Nonetheless, beliefs and practices
grounded in tenets or precepts of groups or entities that are more
social and political than religious do not qualify as religious
within Title VII. <u>Bellamy v. Mason's Stores, Inc.</u>, 508 F.2d 505
(4th Cir. 1974). Nor does Title VII not provide protection for
personal preferences. <u>E.E.O.C. v. Union Independiente</u>, 279 F.3d
49; <u>Brown v. Pena</u>, 441 F. Supp. 1382, 1385(D.C. Fla. 1977) (holding
that a "personal religious" creed concerning Kozy Kitten Cat Food
is a personal preference and not a religious belief).

        However, in assessing whether a belief or practice is
religious in nature courts have "no authority to determine what is
or is not a religion," and courts are not to evaluate religious
truth. <u>Chaplin v. Du Pont Advance Fiber Systems</u>, 293 F. Supp. 2d
622, 629 (E.D. Va. 2003)(citing <u>United States v. Lee</u>, 455 U.S. 252,
257 (1982)). Rather, the task of the courts is limited to
determining whether a claimant's belief is "in her own scheme of
things, religious." <u>Id.</u> (citing <u>United States v. Seeger,</u> 380 U.S.
163, 165 (1965)).

        Within this framework, there exists a genuine dispute of
material fact respecting whether Andrews' belief and practice is
religious. Andrews began using the title Reverend after receiving
her Masters of Divinity degree and as a result of her ordination
and her status as a Minister of the Baptist faith. She uses the

title in both her personal and professional life, and the use of the title is, according to Andrews, based on her religious beliefs "that a minister of God should act as such . . . in all aspects of his or her Earthly life." Use of the title also is, according to Andrews, one of her religious practices. Further, there is evidence that Andrews' beliefs and practices relate to what is morally and ethically right or wrong and as such falls within the E.E.O.C.'s definition. The record shows that Andrews consistently has used the title and that VUU has addressed her as such in a variety of employment settings. On this record, it appears that Andrews has raised sufficient evidence to present triable issues respecting whether her belief and practice are of a religious mature.

In Count I, Andrews alleges disparate treatment in that she was generally treated unfairly and specifically not reappointed as Chair of the Department of Social Work. She has offered evidence that this treatment was based on her religious belief and practice to be referred to as Reverend. Andrews does not provide direct evidence of a purpose to discriminate but she has provided circumstantial evidence of sufficiently probative force to raise a triable issue of fact. Through various depositions and affidavits, Andrews has provided evidence that, following her objection to the new academic policy, which prohibited the use of the title Reverend, various individuals at VUU such as, Anderson and James,

16

made derogatory statements about Andrews, took various actions adverse to her, and expressed their desire to "get rid" of her. This evidence provides sufficient probative force to raise an issue of genuine fact regarding whether Andrews was discriminated against on account of her religion and whether Anderson and James acted with intent to discriminate.[4]  There also is evidence from which a jury could find that Andrews' alleged belief and practice is merely a personal preference; that VUU did not discriminate against Andrews; and that VUU had legitimate non-discriminatory reasons for its actions.  There being factual disputes over material issues, the motion for summary judgment on Count I will be denied.

**Count II:          Denial of Reasonable Accommodation for Religious
                    Expression**

Count II asserts a claim of religious discrimination based on denial of reasonable accommodation for religious expression. Title VII not only requires an employer to refrain from discriminating against an employee based on religion, but it also provides that "religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's religious observance."  42 U.S.C.A. § 2000e(j).  Thus, under Title VII, an employer must make accommodations for an employee's religion and an employer is liable when it refuses to

---

[4] The defendants do not dispute the sincerity of Andrews' beliefs and practices.

make "reasonable accommodations, short of undue hardship." Trans
Worlds Airlines, Inc., 432 U.S. at 74.  The elements of a failure
to accommodate claim are:   (1) a bona fide religious belief or
practice that conflicts with an employment requirement; (2) the
conveyance of such belief to the employer; and (3)discipline of
employee  for  failure  to  comply  with  conflicting  employment
requirement.  E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d
307,  312  (4th  Cir.  2008).   All  elements  of  this  claim  are  in
dispute.

        Reasonable  accommodation  claims  are  analyzed  under  the
burden shifting scheme of McDonnnell Douglas, 411 U.S. 792, 802
(1973).    If  plaintiff  carries  her  initial  burden  of  proving  a
prima facie case, the burden then shifts to defendant to show that
it could not "reasonably accommodate plaintiff's religious needs
without undue hardship."  Chalmers, 101 F.3d at 1019.  The purpose
behind  the  notice  requirement  is  to  allow  the  employer  an
opportunity  to  provide  a  reasonable  accommodation  for  the
employee's religious beliefs.  Id. at 1019.  The employer thus must
demonstrate either:  (1) that it provided the plaintiff with a
reasonable accommodation for his or her religious observances; or
(2) that the accommodation was not provided because it would have
caused an undue hardship.   Firestone, 515 F.3d at 312 (citing
Ansonia Bd. of Educ. v. Philbrook,479 U.S. 60, 67 (1986)).

As explained above in the discussion of Count I, there is a genuine dispute of material fact respecting whether Andrews' belief and practice is religious in nature. The alleged belief and practice is in conflict with the VUU rule. The first element is thus satisfied.

Andrews also has satisfied the second element of a prima facie case: the employer was informed of Andrews' religious belief and the conflict with the VUU policy. Andrews spoke directly to her supervisor, Onyedike, just a few days after the email was distributed, telling him that as a person of faith she felt the email discriminated against her. Additionally, although James stated that Andrews did not voice to James personally an objection to the academic title policy, James acknowledged that she was aware of Andrews' unhappiness about the policy and her desire to be called Reverend.

While VUU's "[k]nowledge that an employee has strong religious beliefs" is not sufficient to place it on notice of such beliefs, Andrews was not required to "officially" inform VUU. See Chalmers, 101 F.3d at 1020. However, Andrews was merely required to provide enough information about her religious belief to permit VUU to understand the existence of the conflict between her religious belief and VUU's job requirements or policies. Id. (citing Brown v. Polk County, 61 F.3d 650, 654 (8th Cir. 1995). Andrews informed her supervisor, Onyedike, of the conflict between her desire to be

called Reverend and the academic title policy and further James was aware of Andrews' position. The evidence is sufficient to allow a reasonable jury to conclude that the notice requirement was satisfied. See id. at 1021 (explaining that the plaintiff's claimed failed because the she did not provide direct or indirect notice of her religious belief or need for accommodation).

Finally, until recently, VUU did not content that it made an effort to accommodate Andrews' religious belief or practice. However, VUU recently, and belatedly, argued that it tried to accommodate Andrews when James requested to meet with Andrews on the "unrelated matter of the new policy regarding the chair of the VUU department" and Andrews refused. That evidence is insufficient to carry the day on the accommodation issue on summary judgment. Moreover, VUU has offered no evidence that any accommodation would result in an undue hardship to it.

The motion for summary judgment on Count II will be denied.

## Count III: Retaliation

Count III alleges a claim of retaliation under 42 U.S.C. § 2000e-3(a) which prohibits employers from retaliating against an employee for either opposing an employment practice that is unlawful under Title VII or participating in any investigation, proceeding or hearing conducted under Title VII. 42 U.S.C. § 2000e-3(a). To prevail on a retaliation claim the plaintiff must show that: (1) she engaged in a protected activity; (2) the

20

employee took an adverse action against her; and (3) the existence of a casual connection between the protected activity and the adverse action.  E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998).  The employee need not prove that the employment practice which the employee is opposing was actually unlawful.  However, the employee is required to prove that she reasonably believed that the employer was engaged in an unlawful practice.  Navy Fed'l Credit Union, 424 F.3d at 406-07.

An employee can demonstrate an adverse employment action by showing that she was the subject of "a discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunity for promotion."  Chaplin, 293 F. Supp. 2d at 627 (citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981).  Additionally, because discrimination is defined more broadly in the retaliation provision of Title VII, courts have interpreted the "adverse action" aspect of the retaliation provision so that it covers a broader range of employer conduct then the kind of the "adverse employment actions" that form the predicate for discrimination claims.  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. ___, 126 S. Ct. 2405, 2412-13, (2006); see also Fitzgerald v. Ennis Business Forms, Inc., 2007 WL 81797 at *6 (W.D. Va. Jan. 8, 2007).  In context of a retaliation claim, the pertinent adverse action can be any action by the employer that

a reasonable employee would view as "materially adverse" so that it would "dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern,</u> 126 S. Ct. at 2415. All three elements of this claim are in dispute.

Andrews has satisfied the first element. Andrews: (1) complained to her supervisor, Onyedike; (2) had letters sent to VUU from her attorney explaining that VUU had violated Title VII; and 3) filed a claim with the E.E.O.C.. Complaining about the new policy is a protected activity and Andrews validly lodged her complaint by speaking with her supervisor, Onyedike. VUU does not contend that Andrews did not reasonably believe in good faith that VUU was violating Title VII by refusing to allow her to be referred to as Reverend and by refusing to reappoint her as department Chair because of her objections. Additionally, Andrews satisfies this element because she engaged in a protected activity when she filed a "Charge of Discrimination" with the E.E.O.C. on June 28, 2006.

Andrews also satisfies the second element. The record reflects that a reasonable jury could find, in Andrews' favor, several facts that demonstrate actions by VUU that a reasonable employee would view as "materially adverse." These include the cancellation of Andrews' book order for her classes, claims by James to "get rid" of Andrews, accusations that Andrews misadvised students, and originally refusing to allow Andrews to carry the mace at the graduation ceremony (a privilege traditionally bestowed

22

on the Scott & Stringfellow Outstanding Faculty Member). These actions are in addition to VUU's refusal to reappoint Andrews as Chair of her department.

Additionally, there is evidence that would allow a reasonable jury to find that Andrews was disciplined for refusing to follow the employee policy that prohibited the use of the title Reverend. Andrews clearly refused to implement the new policy. Following this refusal and Andrews' complaints about the policy, Andrews suffered employment-related treatment at the hands of the employer which a reasonable jury could construe to be discipline for engaging in protected activity. Andrews was not reappointed as Chair of the Department of Social Work and she suffered other mistreatment by VUU. While there is a dispute respecting whether Andrews would have been reappointed if she had not protested the policy, a reasonable jury could find that the failure to reappoint Andrews was VUU's way of disciplining her. This is true especially in light of several comments made by James and Anderson in which they discuss "getting rid" of Andrews in context of Andrews' conduct in objecting to the policy.[5]

---

[5] There were several meetings where James and Anderson discussed "getting rid" of Andrews. Additionally, on November 1, 2005 at a meeting of VUU Deans and Chairs, James addressed objections to the new policy prohibiting students from referring to faculty as Reverend. James alleged that one faculty member was inappropriately circulating her original email with the policy, and stated that she was "pissed about the lack of confidentiality of some faculty with nothing else to do." Furthermore, she went on to say that the memo was circulated by "one faculty member." James said later that she assumed the faculty member who circulated the email was Andrews.

Finally, the record would permit a reasonable jury to find that there was a causal nexus between the protected activity and the adverse actions.

For the foregoing reasons, the motion for summary judgment on Count III will be denied.

## Count IV:  Defamation

Count IV presents a defamation claim under Virginia law against VUU and Carvalho.  The elements of defamation are:  (1) publication;  (2)  of  a  statement  that  is  actionable;  and  (3) requisite intent.  Jordan v. Kollman, 612 S.E.2d 203, 206 (Va. 2005).  Defamation claims may be defeated by a claim of privilege, which, in turn, may be overcome if the plaintiff proves malice.  Great Coastal Exp., Inc. v. Ellington, 334 S.E.2d 846, 853 (Va. 1985).  All elements of defamation in addition to privilege are in dispute.

Publication  of  a  statement  may  occur  where  the  oral statement is overheard by a third party.  Snyder v. Fatherly, 163 S.E.2d 358, 363-64 (Va. 1932).  Statements are actionable if they are statements of fact that are false, but are not actionable if they  are  statements  of  opinion.   Jordan,  612  S.E.2d  at  206-07 (explaining that statements of opinion are not actionable because they  cannot  be  characterized  as  true  or  false).   Whether  a statement is one of actionable fact or is one of not actionable opinion is a matter of law to be determined by the court.  Id.

Plaintiff has the burden of proving that actionable statements of fact are false and whether plaintiff has satisfied this burden is a jury question.   Id. at 207.   In Virginia, statements may be actionable per se.   Such statements include "[t]hose that impute to a person unfitness to perform duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment" and "those that prejudice such a person in his or her profession or trade."   Carwile v. Richmond Newspaper, Inc., 82 S.E.2d 588, 591 (Va. 1954); see also Hatfill v. New York Times Co., 416 F.3d 320, 330 (4th Cir. 2005).   For private individuals, requisite intent is present if the individual making the statement knew it to be false or negligently failed to determine whether it was false.   Gazette, Inc. v. Harris, 325 S.E.2d 713, 725 (Va. 1985).

        These principles inform the analysis of Andrews' defamation claims.   Each allegedly defamatory claim will be examined in turn.

> ### Statement by Carvalho to parents of students that the students would not graduate on time because Andrews had "misadvised" them.

        On December 14, 2006, Andrews and Carvalho met with VUU administrators, students, and parents of students.   The meeting was held to discuss why several students would be unable to graduate on schedule.   During the meeting Carvalho asserted that the students would not be graduating on time because they had been misadvised by

Andrews.[6] This statement clearly was published because it was overheard by third parties, parents, and other VUU administrators.

Andrews also satisfies the second element. Statements are opinions if they are relative in nature and depend upon a viewpoint. Raytheon Tech. Servs., 641 S.E.2d at 90. Furthermore, statements of that sort cannot serve as a basis for defamation because they cannot be proven as true or false. Id. Conversely, statements that support and justify an opinion or opinions that imply an assertion of an objective fact may be deemed actionable. Id. at 90-91. When considering these requirements and reviewing whether a statement is opinion or fact, courts do not isolate one portion of the statement at issue from another portion, but view the context in which the statement is made. Id.

The "misadvising" statement is one of fact and thus is actionable. First, the statement is "laden with factual content" and includes an assertion of an objective fact. Id.; Richmond Newspapers, Inc. v. Lipscomb, 262 S.E.2d 32, 43 n. 8 (Va. 1987). The objective fact is that the students did not graduate because they received the incorrect information from Andrews. Their failure to receive the correct information about course selection was asserted as the cause of their inability to graduate. Therefore, the "misadvise" statement is one of fact. But, even viewing the "misadvise" statement as an opinion, it is actionable.

---

[6] Carvalho additionally made statements that "if she were in [the parents'] shoes [she would] jump[ ] across the table at the throat of the person who did this [misadvised the students]."

Second, the statement itself, including "misadvise," appears to be one that can be proved as true or false; either Andrews gave the students the correct information or she did not. Id. at 91; Jordan, 612 S.E.2d at 206-07. In fact, this is exactly what VUU and Andrews dispute in the record. Finally, not only is it an actionable statement because it is factual or laden with factual information, but it falls within the category of a statement that is actionable per se because the statement posits the assertion that Andrews is unfit to perform her duties as a professor at VUU. Carwile, 82 S.E.2d at 592.

The factual record also supports the third element of defamation that Carvalho knew the statement was false when she made it or she or she negligently failed to determine whether it was false. Carvalho has testified that the Chair of a department is vested with discretion to allow students to take classes out of sequence. Carvalho's allegation that students were misadvised, however, is based on the fact that they were allowed to take classes out of sequence. Additionally, the record shows that Carvalho did not take the time to question Andrews regarding the situations in which the students where allegedly misadvised or make any effort to determine the truth or falsity of her accusation against Andrews. Thus, a reasonable jury could conclude that Carvalho knew the "misadvising" statement to be false or carelessly failed to determine its truth.

27

Finally, there is the issue of a qualified privilege which may exist if the statements are "a communication, made in good faith, on subject matter in which the person communicating has an interest." Great Coastal Exp. v. Ellington, 334 S.E.2d 846, 853 (Va. 1985). The determination of privilege is to be decided by the court. Id. A qualified privilege may be lost if plaintiff proves malice by clear and convincing evidence. Id. at 854. Additionally, employment matters are issues in which the absence of malice is presumed, an showing of maliciousness must be made affirmatively. Larimore v. Blaylock, 528 S.E.2d 119, 122 (Va. 2000). The privilege, however, may be lost in employment matters if "defamatory statements are communicated to third parties that have no duties or interest in the subject matter, even if those third parties are fellow employees." Id.

The defamatory statement discussing students who were allegedly misadvised by Andrews was a statement made by Carvalho regarding a subject matter in which she has an interest. Carvalho is the Chair of the Department of Social Work, and the students, their course selection, and the advising of students all are logically within her concern. Additionally, all of the parties who were privy to the comments; students, VUU administrators, Andrews, and parents, had an interest in the subject matter.

The record permits a reasonable jury to conclude that Carvalho disliked Andrews and that Carvalho wanted to get rid of

28

Andrews.   When that evidence is considered in perspective of the comments made about Andrews, a jury could find the absence of good faith. Even assuming, however, that there was good faith and that a qualified privilege is established, there is evidence in the record from which a jury could find malice which would overcome the privilege.   There are statements by several VUU employees that support Andrews' argument of "sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff."   Great  Coastal  Exp, 334 S.E.2d at 846.   More specifically there are comments in the record in which Carvalho refers to Andrews with statements such as; "people around here make me want to kill them," "stupid stubborn ass bitch," "I can't stand that bitch," "she makes me sick."   This determination of malice, however, is to be decided by the jury.   Smalls v. Wright, 399 S.E.2d 805, 808 (Va. 1991).  Thus, the privilege assertion presents no basis for summary judgment on Count IV.

On this record, the motion for summary judgment must be denied.

> **Email from Carvalho to Andrews stating that Andrews did not provide Carvalho with the necessary files related to the accreditation of the Department of Social Work.**

In an email dated November 3, 2006, Carvalho communicated with Andrews about the accreditation of the Department of Social Work. The email was addressed to Andrews but Hylton, the Dean of the School of Humanities and Social Services at VUU, was sent a copy.

In the email, Carvalho states that CSWE officials were "surprised
to learn that [Andrews] ha[d] not provided copies of files and
correspondence with CSWE regarding accreditation and
reaffirmation." Carvalho went on to "remind" Andrews of the
National Association of Social Worker's ("NASW") Code of Ethics and
finally ended the email requesting that Andrews provide the
referenced documentation.) Andrews argues that this email
contained two messages. First, she says that the email asserted
that Andrews was supposed to provide copies of the accreditation
documentation to Carvalho and had failed to do so. These alleged
improprieties were communicated to both Hylton and CSWE officials
whom Carvalho made the comment at the "BPD conference." Second, by
reminding Andrews of the NASW Code of Ethics, Carvalho allegedly
insinuated that Andrews was acting unethically.

These statements, quite clearly were published. That is
beyond dispute. Both statements are matters of fact, not opinion.
However, neither statement is disparaging of Andrews' reputation.
The first simply raises an administrative issue: the location of
documents and whether Andrews complied with a request to deliver
them to Carvalho. The second merely points out an ethics code. It
stretches either statement too far to characterize it as reputation
damaging. Thus, a reasonable jury could not find in either
statement an intent to defame. Carvalho is entitled to summary
judgment on that aspect of Count IV.

30

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Docket Nos. 27 and 29) is denied as to Counts I, II and III, and denied in part and granted in part as to Count IV.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.

/s/                    *Rℰℓ*

Robert E. Payne
United States District Judge

Richmond, Virginia
Date: May 15, 2008

31